25-2682, 25-2685

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CHRISTOPHER KAZUO KAMON

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Central
District of California, The Honorable Josephine L. Staton, Presiding.
CR Nos. 2:23-cr-00024 and 2:23-cr-00047

_____

**APPELLANT'S OPENING BRIEF**

_____

COHEN WILLIAMS LLP
Alyssa D. Bell (Bar No. 287751)
Email: abell@cohen-williams.com
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

WILLKIE FARR & GALLAGHER LLP
Koren Bell (Bar No. 268614)
Email: kbell@willkie.com
2029 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone: (310) 855-3016
Facsimile: (310) 855-3099

*Attorneys for Defendant-Appellant Christopher Kazuo Kamon*

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..........................................................1

II. QUESTIONS PRESENTED ...........................................................5

III. STATUTORY AND GUIDELINES PROVISIONS INVOLVED ...............6

IV. JURISDICTIONAL STATEMENT ...................................................6

V. DETENTION STATUS ................................................................6

VI. STATEMENT OF FACTS .............................................................7

    A. Background. .....................................................................7

    B. The Offense Conduct...........................................................7

        1. The "main fraud." .....................................................8

        2. The "side fraud." .....................................................9

    C. Charges and Plea. .............................................................9

    D. The Presentence Report (PSR)............................................10

    E. The Trustee's "Victim Impact" Statements. ...........................10

    F. Kamon's Sentencing Submissions. .......................................12

    G. The Government's Sentencing Position and Trustee "Victim Impact" Statement. ............................................................12

    H. Breach of the Plea Agreement..............................................13

    I. The Sentencing Hearing and Trustee "Victim Impact" Allocution. ....................................................................14

    J. Girardi's Sentencing..........................................................16

VII. SUMMARY OF ARGUMENT....................................................17

VIII. ARGUMENT........................................................................20

i

A.     The District Court Committed Layers of Reversible Error at
       Sentencing. .................................................................................20

   1.     The court erred by permitting the bankruptcy trustee—
          who was neither a "crime victim" nor a "lawful
          representative"—to exercise statutory victim rights.................20

          a.     Standard of Review .........................................................20

          b.     The trustee's inflammatory sentencing
                 presentation—urging the "maximum" sentence for
                 Kamon's "horrible" crimes—was statutorily-
                 unauthorized and undermined due process....................20

   2.     The district court erred in computing the Sentencing
          Guidelines. ................................................................................25

          a.     Standard of review.........................................................26

          b.     The court's application of a 20-level adjustment
                 using the 2024 definition of "intended" loss
                 violated the Ex Post Facto Clause. .................................26

          c.     Grouping under § 3D1.2(d) did not authorize the
                 court's automatic aggregation of count-specific
                 enhancements to the total offense level without
                 first applying § 1B1.3's relevant-conduct rule...............29

          d.     The district court's application of an aggravating
                 role enhancement, and denial of a mitigating role
                 adjustment, was erroneous.............................................35

                 i.     The court failed to resolve a key factual
                        dispute, as Rule 32 required, before applying
                        an aggravating role enhancement.........................36

                 ii.    The court failed to compare Kamon's
                        conduct to Girardi's, or to sufficiently state
                        its reasons, before declining to apply a
                        mitigating role adjustment...................................38

          e.     The court erred in applying the vulnerable victim
                 enhancement for "personal injury clients" without

ii

the requisite finding they were unusually susceptible to the crime. ...................................................40

      f.     The court erred in applying the sophisticated means enhancement to conduct that failed to demonstrate the requisite sophistication.........................43

   3.    The court's failure to consider mitigation evidence, when considered cumulatively with the balance of the errors, rendered Kamon's 121-month sentence procedurally unreasonable...............................................................48

      a.    Standard of Review. .........................................48

      b.    The court erred procedurally when it ignored mitigation critical to its evaluation of the § 3553(a) factors. ...............................................................48

   4.    The cumulative effect of the court's errors warrants reversal. ...............................................................51

B.    The Government's Implicit Breach of the Plea Agreement—Including Through Its Repeated Proffer of the Trustee's Statutorily-Unauthorized Sentencing Presentation—Warrants Resentencing. ...............................................................51

   1.    Standard of Review.................................................52

   2.    The government's implicit breach of the plea agreement permits this Court to reach the merits of Kamon's appeal and independently requires resentencing before a different court.................................................................52

C.    This Court may reach the merits of Kamon's illegal sentence. ..........57

IX.   CONCLUSION.................................................................................58

CERTIFICATE OF RELATED CASES ...............................................60

CERTIFICATE OF COMPLIANCE.....................................................61

iii

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beaird v. United States*,
No. 25-5343 (Apr. 20, 2026) ...................................................................34

*Bowe v. United States*,
146 S. Ct. 447 (2026)...............................................................................31

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001).................................................................................46

*Fischer v. United States*,
603 U.S. 480 (2024)........................................................................ 45, 46

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995).................................................................................32

*Hunter v. United States*,
146 S.Ct. 1702 (2026)..............................................................................58

*In re Mikhel*,
453 F.3d 1137 (9th Cir. 2006) .................................................................21

*Kenna v. U.S. Dist. Ct. for C.D. Cal.*,
435 F.3d 1011 (9th Cir. 2006) .................................................................20

*Kisor v. Wilkie*,
588 U.S. 558 (2019)........................................................................ 18, 27

*Peugh v. United States*,
569 U.S. 530 (2013) ................................................................ 18, 26, 28

*Rita v. United States*,
551 U.S. 338 (2007).................................................................................49

*Santobello v. New York*,
404 U.S. 257 (1971).................................................................................56

*Singh v. Att'y Gen. of the U.S.*,
677 F.3d 503 (3d Cir. 2012) ....................................................................23

*Stinson v. United States*,
    508 U.S. 36 (1993)..............................................................34

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)..............................................................31

*United States v. Alcala-Sanchez*,
    666 F.3d 571 (9th Cir. 2012) .............................................56

*United States v. Apodaca*,
    641 F.3d 1077 (9th Cir. 2011) ...........................................48

*United States v. Augare*,
    800 F.3d 1173 (9th Cir. 2015) ...........................................47

*United States v. Banks*,
    55 F.4th 246 (3d Cir. 2022) ............................... 18, 27, 28

*United States v. Bibler*,
    495 F.3d 621 (9th Cir. 2007) .............................................57

*United States v. Blinkinsop*,
    606 F.3d 1110 (9th Cir. 2010) ...........................................48

*United States v. Carter*,
    219 F.3d 863 (9th Cir. 2000) ............................... 26, 36

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) .......................... 25, 48, 49

*United States v. Castaneda*,
    239 F.3d 978 (9th Cir. 2001) ............................... 41, 43

*United States v. Castellanos*,
    81 F.3d 108 (9th Cir. 1996) ............................... 19, 42

*United States v. Cueto*,
    9 F.3d 1438 (9th Cir. 1993) ..............................................34

*United States v. Diaz*,
    884 F.3d 911 (9th Cir. 2018) ............................... 38, 39

*United States v. Farias-Contreras*,
104 F.4th 22 (9th Cir. 2024) ..................................................... 19, 52

*United States v. Frederick*,
78 F.3d 1370 (9th Cir. 1996) ...........................................................51

*United States v. Gasca-Ruiz*,
852 F.3d 1167 (9th Cir. 2017) ........................................................26

*United States v. Gonzalez*,
16 F.3d 985 (9th Cir. 1993) .............................................................57

*United States v. Hanna*,
49 F.3d 572 (9th Cir. 1995) ..................................................... 18, 25

*United States v. Heredia*,
768 F.3d 1220 (9th Cir. 2014) ........................................................52

*United States v. Holden*,
908 F.3d 395 (9th Cir. 2018) ..........................................................37

*United States v. Holthaus*,
486 F.3d 451 (8th Cir. 2007) ..........................................................23

*United States v. Horob*,
735 F.3d 866 (9th Cir. 2013) ..........................................................47

*United States v. Houston*,
217 F.3d 1204 (9th Cir. 2000) ................................................. 19, 36

*United States v. Inzunza*,
638 F.3d 1006 (9th Cir. 2011) ........................................................51

*United States v. Johnson*,
187 F.3d 1129 (9th Cir. 1999) ......................................... 25, 53, 56

*United States v. Kirilyuk*,
29 F.4th 1128 (9th Cir. 2022) .........................................................33

*United States v. Klassy*,
409 F. App'x 169 (9th Cir. 2011) ...................................................22

*United States v. Laurienti*,
731 F.3d 967 (9th Cir. 2013) .......................................................48

*United States v. Lowell*,
256 F.3d 463 (7th Cir. 2001) .......................................................23

*United States v. Matsumaru*,
244 F.3d 1092 (9th Cir. 2001) .....................................................42

*United States v. Mondragon*,
228 F.3d 978 (9th Cir. 2000) ................................................ 53, 57

*United States v. Nazifpour*,
944 F.2d 472 (9th Cir. 1991) .......................................................22

*United States v. Nielsen*,
694 F.3d 1032 (9th Cir. 2012) ............................................... 41, 43

*United States v. Ortland*,
109 F.3d 539 (9th Cir. 1997) .......................................................26

*United States v. Paradis*,
219 F.3d 22 (1st Cir. 2000)................................................... 22, 23

*United States v. Quach*,
302 F.3d 1096 (9th Cir. 2002) .....................................................25

*United States v. Quintero-Leyva*,
823 F.3d 519 (9th Cir. 2016) ................................................. 19, 39

*United States v. Tanke*,
743 F.3d 1296 (9th Cir. 2014) .....................................................47

*United States v. Terabelian*,
105 F.4th 1207 (9th Cir. 2024) ....................................................44

*United States v. Torres*,
828 F.3d 1113 (9th Cir. 2016) .....................................................57

*United States v. Trujillo*,
713 F.3d 1003 (9th Cir. 2013) .......................................... *passim*

*United States v. Wells*,
29 F.4th 580 (9th Cir. 2022) ........................................................................57

*United States v. Whitney*,
673 F.3d 965 (9th Cir. 2012) ................................................................. 52, 56

*United States v. Wilson*,
131 F.3d 1250 (7th Cir. 1997) ........................................................ 18, 33, 34

*United States v. Yamashiro*,
788 F.3d 1231 (9th Cir. 2015) ................................................................ 18, 25

*Yates v. United States*,
574 U.S. 528 (2015).....................................................................................46

**Statutes**

18 U.S.C. § 3231 ...........................................................................................6

18 U.S.C. § 3553 ................................................................................ 12, 25, 48

18 U.S.C. § 3663A .......................................................................................22

18 U.S.C. § 3742 ...........................................................................................6

18 U.S.C. § 3771 ................................................................................... *passim*

28 U.S.C. § 1291 ...........................................................................................6

U.S.S.G. § 1B1.11.......................................................................................26

U.S.S.G. § 1B1.3.................................................................................. *passim*

U.S.S.G. § 2B1.1.................................................................................. *passim*

U.S.S.G. § 3A1.1.................................................................................. *passim*

U.S.S.G. § 3B1.1.................................................................................. 10, 36

U.S.S.G. § 3B1.2.................................................................................. *passim*

U.S.S.G. § 3D1.2.................................................................................. *passim*

U.S.S.G. § 3D1.3.................................................................................. *passim*

**Rules**

Fed. R. Crim. P. 32...................................................................... *passim*

## I.  PRELIMINARY STATEMENT

For sixteen years, Christopher Kamon served as head of accounting at Girardi Keese, a Los Angeles personal-injury firm famous for securing landmark settlements for victims of catastrophic accidents.  That fame turned to infamy when the public learned that Thomas Girardi, the firm's owner and managing partner, had stolen from his clients—misappropriating settlement funds to keep the firm afloat and line his own pockets.

Girardi was, in the government's words, the "architect and driver" of the fraud and its primary beneficiary.  (2-ER-249.)  He devised and controlled the scheme, negotiated settlements, controlled the trust accounts, determined which client funds to misappropriate, and lied to clients about the status of their money.  But Girardi needed someone to move funds as he directed, and for that, he enlisted Kamon.  Kamon had no "involvement in any case-specific matters beyond accounting," as the government told the district court, and at all times acted at Girardi's "direction." (2-ER-294, 339.)

Although Kamon led the accounting department, he had no formal training in accounting.  Girardi had groomed Kamon from early in his career, providing on-the-job training and earning his trust.  When the firm's operating accounts ran low, Girardi told Kamon which trust account to draw from and how to code the withdrawal.  When Kamon flagged that fees had already been taken from a case,

1

Girardi told him to "do it anyways." (2-ER-281, 328; PSR-18.) Kamon never interfaced with clients. "[I]t was Girardi—not Kamon—who repeatedly lied to clients to delay paying them money he owed." (2-ER-339.)

When Girardi Keese collapsed in December 2020, Girardi and Kamon chose different paths. Girardi went to trial, took the stand, and denied ever stealing client money. Unconvinced, the jury convicted him on all counts. Kamon, in contrast, took responsibility. He proffered on five occasions, providing substantial information about Girardi Keese. He admitted to aiding and abetting Girardi's embezzlement scheme (the "main fraud") and to separately misappropriating firm funds for personal use in a distinct scheme (the "side fraud"). He signed a plea agreement and accepted full responsibility for his role in each one.

At sentencing, Girardi and Kamon fared differently—but not in a manner reflective of their relative culpability. Girardi received 87 months. (2-ER-143.) Kamon received 121 months—nearly 40% more—despite his subordinate role, cooperation, and guilty plea. (1-ER-2.) That outcome was the product of layers of error.

As an initial matter, the district court permitted the Girardi Keese Chapter 7 bankruptcy trustee—who was neither a statutory "crime victim" nor a "lawful representative"—to deliver a highly inflammatory and unreliable allocution immediately before she imposed Kamon's sentence. The government proffered her

written statement and live testimony as "required" victim-impact evidence and, thus "assured" of her "victim" status, the court allowed it on that basis. (1-ER-66.) The trustee excoriated Kamon for his "horrible" crimes, urged the "maximum sentence," alleged losses affecting "hundreds of clients" nearly double the plea agreement's cap, described a host of uncharged bad acts, told the court that Kamon's expression of remorse was not credible, and underscored the scale of harm to clients who "deserve to see justice done." (1-ER-67-71; 4-ER-448.) The court relied explicitly on the trustee's presentation in imposing Kamon's sentence. That was procedural error and violated Kamon's due process rights.

The district court then committed a cascade of Guidelines errors that dramatically inflated the advisory range. It applied the 2024 version of § 2B1.1 to calculate a 20-level loss enhancement based on "intended" loss—a substantive change that took effect only after Kamon's conduct ended—violating the Ex Post Facto Clause. It assumed that grouping under § 3D1.2(d) automatically authorized aggregating enhancements arising from only *one* scheme to the total offense level under § 3D1.3 without conducting the relevant-conduct analysis § 1B1.3 requires—adding eight levels for enhancements that it found applied *only* to one fraud or the other. The court also erred in deciding that certain adjustments applied (or failed to apply) in the first instance. It denied a mitigating-role adjustment despite undisputed evidence that Kamon acted entirely at Girardi's direction in the main fraud, and

3

applied an aggravating-role enhancement for the side fraud without resolving critical factual disputes as Federal Rule of Criminal Procedure 32 requires. It applied a vulnerable-victim enhancement for the main fraud based solely on the victims' categorical status as "personal injury clients," when this Court's precedent requires a finding of unusual susceptibility. And it applied the sophisticated-means enhancement for main-fraud conduct, despite acknowledging Kamon's lack of direct involvement in those aspects of the scheme, and for side-fraud conduct that fell far short of the required threshold.

The court compounded its errors by failing to address Kamon's mitigation presentation—including his requested variance based on his cooperation and the glaring disparity with Girardi—in violation of this Circuit's precedent requiring sufficient reasons for meaningful appellate review.

The government, for its part, made a sentencing presentation—including its repeated, erroneous proffer of the trustee's inflammatory "victim impact" statements—that implicitly breached the plea agreement by conveying that the negotiated recommendation understated Kamon's culpability, the loss amount, and the punishment he deserved.

Each of these errors independently warrants reversal and remand for resentencing. Cumulatively, they render Kamon's sentence procedurally unreasonable.

## II.   QUESTIONS PRESENTED

1.      Whether the district court committed reversible error and violated Kamon's due process rights by permitting the bankruptcy trustee—who was neither a "crime victim" nor a "lawful representative" under 18 U.S.C. § 3771—to exercise statutory victim rights at sentencing?

2.      Whether the district court violated the Ex Post Facto Clause by applying the 2024 version of § 2B1.1(b)(1), which moved "intended" loss from the commentary into the Guideline text, to increase Kamon's offense level for pre-2024 conduct?

3.      Whether the district court committed procedural error in calculating the Guidelines by (a) automatically aggregating count-specific enhancements to the grouped offense level under § 3D1.3 without conducting the relevant-conduct analysis required by § 1B1.3(a); (b) applying an aggravating role enhancement under § 3B1.1(c) for side-fraud conduct without resolving factual disputes as required by Rule 32; (c) denying a mitigating role adjustment under § 3B1.2 for main-fraud conduct without conducting the five-factor analysis required by precedent; (d) applying the vulnerable-victim enhancement under § 3A1.1(b) for main-fraud conduct without individualized findings of unusual susceptibility required by precedent; and (e) applying a sophisticated-means enhancement under §

5

2B1.1(b)(10)(C) for side-fraud conduct that fell far short of the required threshold, and for main-fraud conduct in which Kamon took no part?

4. Whether the district court's failure to address Kamon's non-frivolous mitigation arguments rendered his sentence procedurally unreasonable?

5. Whether the government implicitly breached the plea agreement through a sentencing presentation conveying that the negotiated recommendation understated Kamon's culpability, the loss amount, and the punishment he deserved?

## III. STATUTORY AND GUIDELINES PROVISIONS INVOLVED

The relevant Sentencing Guidelines and statutory authority are reproduced in the Addendum to this brief.

## IV. JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## V. DETENTION STATUS

Kamon is currently in the custody of the Bureau of Prisons, serving the 121-month sentence imposed in this case. His projected release date is February 25, 2031.[1]

---

[1] https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results.

## VI. STATEMENT OF FACTS

### A. Background.

From 2004 until December 2020, Kamon served as the head of accounting at Girardi Keese, a personal-injury plaintiffs' firm owned and managed by Girardi. (PSR-79.)  Kamon lacked formal accounting training and learned on the job, both from his predecessor and Girardi.  (PSR-94-95.)  He joined Girardi Keese during a personal health crisis and underwent treatment for Non-Hodgkin's Lymphoma.  The firm continued paying his full salary while his parents faced bankruptcy—support he credited with cementing his loyalty to Girardi.  (PSR-109-10; 2-ER-217-18.)

Girardi generated substantial revenue and fostered a culture of excess, allowing employees to charge personal expenses to the firm's American Express account.  (2-ER-217-18, 232-33.)

### B. The Offense Conduct.

The government charged Kamon in two distinct schemes: the "main fraud," in which he aided Girardi's embezzlement of client settlement funds, and the "side fraud," his separate embezzlement of Girardi Keese funds through fictitious vendor invoices.  (PSR-18, 23-24.)  The government described the harm from the two schemes as "separate and distinct."  (2-ER-249, 260.)

7

1.    *The "main fraud."*

Beginning as early as 2010, Girardi directed diversion of client settlement proceeds from IOLTA accounts to pay firm expenses, cover shortfalls, and fund personal expenses.  Girardi was, in the government's words, the "architect and driver" of the main fraud and its primary beneficiary. (2-ER-249.) He alone decided which clients would be paid and when, signed outgoing trust-account checks, and lied to clients about their funds.  (PSR-17-18; 2-ER-229-30.)

Kamon's role was ministerial: he reported balances, printed checks for Girardi's signature, and coded transfers as directed.  (PSR-17-18; 2-ER-229-30.) When operating accounts ran low, Girardi directed Kamon to transfer funds from IOLTA accounts and label the withdrawals as attorneys' fees.  And, when Kamon warned that fees had already been taken from a case, Girardi said to "do it anyways." (PSR-17-18.)  Kamon lacked signatory authority over client trust accounts, which Girardi controlled exclusively.  (2-ER-229-30.)

As the government put it, "Girardi—not Kamon … lied to clients," while Kamon had no client or case-specific involvement "beyond accounting."  (2-ER-291, 293-94, 339.)  Kamon, at all times, acted at Girardi's "direction." (2-ER-294, 339.)

8

2. *The "side fraud."*

In addition to aiding Girardi's main fraud, Kamon worked with two others to siphon Girardi Keese funds through false invoices for services never rendered, using the proceeds for personal expenses. In total, he misappropriated $6.6 million. (2-ER-334; PSR-24-25.)

## C. Charges and Plea.

In 2020, the government indicted Kamon and Girardi for the main fraud, and Kamon alone for the side fraud. Girardi denied wrongdoing and went to trial. The jury convicted him on all counts. (2-ER-110.) Kamon instead cooperated with the government, proffering five times and providing substantial information about Girardi Keese. (PSR-32-36; 2-ER-217.) He pleaded guilty to two counts of wire fraud, one for each scheme, in October 2024. (PSR-15.)

As part of Kamon's consolidated plea agreement, the parties agreed to a Guidelines framework. The government stipulated that the loss was less than $25,000,000, capping the loss enhancement at plus-20 under § 2B1.1(b)(1), agreed not to "contest" stipulated facts, and committed to recommend both the acceptance-of-responsibility reduction and "the low end of the applicable guideline range." (2-ER-312-13, 317.)

9

### D. The Presentence Report (PSR).

Probation prepared an initial PSR (PSR-10) and an Amended PSR (PSR-72), which removed a zero-point offender reduction initially applied. (PSR-129.) Although Kamon's offense conduct occurred before November 1, 2024, the PSR utilized the 2024 Guidelines Manual—which moved "intended loss" from the commentary into the Guideline text—to compute a 22-level loss enhancement based on intended loss of $19,436,985.34, yielding a total offense level of 34 and a Guidelines range of 151 to 188 months. (PSR-99-100.) The PSR grouped the counts under § 3D1.2(d) and applied enhancements it found to arise from only one scheme, not the other, to the total offense level: substantial financial hardship, § 2B1.1(b)(2)(A)(iii), and vulnerable victim, § 3A1.1(b)(1), from the main fraud; sophisticated means, § 2B1.1(b)(10)(C), and aggravating role, § 3B1.1(c), from the side fraud. (PSR-38-41.) No mitigating role adjustment, § 3B1.2(b), was applied for the main fraud—the scheme that drove the offense level computation in the grouped calculation. (*Id.*)

### E. The Trustee's "Victim Impact" Statements.

The PSR also included the bankruptcy trustee's purported "victim impact" statements, which the government had provided to Probation. (4-ER-444.) The trustee's letter regarding the "defalcations" of Girardi and his firm urged the Court—twice—to impose the "maximum time" to do "justice" for clients "victimized once"

10

by their injuries and "victimized a second time" by the scheme. (PSR-29-32.) The report referenced a "finding by the Honorable District Judge Durkin in Chicago that the Girardi Firm had received more than $1 million in settlement funds from the Lion Air airplane crash in Indonesia on behalf of the Girardi Firm's clients, but had not paid the clients their share of the settlement proceeds;" detailed the "magnitude of the impact" of the scheme "far beyond the clients who have testified in this Court," including "hundreds of clients who were financially and emotionally damaged;" and lamented that "no amount will be sufficient to recompense the former clients for the emotional stress and financial hardship." (*Id*.) The letter also attached a statement from the estate's forensic accounting expert "detail[ing] the misuse of the IOLTA Trust Accounts dating back to 2002," years before the at-issue conduct. (*Id*.)

The trustee's second letter, specific to Kamon, implored the court to "impose the maximum sentence" due to the "magnitude of the impact of Mr. Kamon's defalcations which compounded those of Mr. Girardi," damaging "hundreds of clients," "far beyond the clients who have testified," who "deserve to see justice done." (PSR-29-32; 4-ER-448.) The letter also described a host of uncharged bad acts—including claiming that Kamon spent "over $22,100,000" on the firm's American Express card, nearly double the plea agreement's loss cap, and that he "swapped out the original hard drive in his office computer with a new and largely

11

blank one," rendering it "devoid of any data"—and opined that he did not genuinely accept responsibility. (4-ER-446-49.)

### F. Kamon's Sentencing Submissions.

Kamon's sentencing submissions argued that (1) the PSR's reliance on intended loss violated the Ex Post Facto Clause; (2) the distinct schemes should not be grouped and the count-specific enhancements should not apply to the grouped offense level; (3) the substantial-financial-hardship and vulnerable-victim enhancements did not apply based on main-fraud conduct; (4) the aggravating role and sophisticated means enhancements did not apply based on side-fraud conduct; (5) Kamon's main-fraud role warranted a two-level mitigating-role reduction; (6) Kamon was entitled to a zero-point-offender reduction; and (7) a 30-month sentence was sufficient under 18 U.S.C. § 3553(a), given Kamon's cooperation, lack of criminal history, pretrial detention, and the unwarranted disparity with Girardi's recommended sentence. (2-ER-149, 211, 271.)

### G. The Government's Sentencing Position and Trustee "Victim Impact" Statement.

The government's sentencing memorandum repeatedly characterized Kamon's conduct as "brazen;" described him as a "gatekeeper" with an "integral and essential" role in the main fraud and the "mastermind" of the side fraud; characterized him as having the "same cynical, devious, and cavalier approach exhibited by Girardi;" and asserted that his conduct warranted a "significant

12

custodial sentence."  (2-ER-246-47, 256, 258, 264-65.)  The government also emphasized that, despite Kamon's acceptance of responsibility, he had made efforts to impede liquidation of his assets.  And it highlighted unrelated criminal charges in another jurisdiction, allegedly "for similar conduct."  (*Id.*)

With respect to the computation of loss, the government devoted a full page to repeating the PSR's computation, then stated that it "agrees with Probation's conclusion that the total offense level is 32," while "reach[ing] that level by slightly different calculations."  (2-ER-254.)  It also explained that the agreed-upon cap excluded "additional loss" discovered after the plea was negotiated.  (*Id.*)

The government attached the trustee's letter as an exhibit and told the court that the submission was "required"—that it was "a necessary component of the proceedings," and that prosecutors were "just acting in accord with the Government's responsibilities under the CVRA to bring it to the Court's attention." (1-ER-66; 2-ER-172-73.)  The government ultimately recommended a sentence of 121 months, the low-end of the sentencing Guidelines range it computed.  (2-ER-258.)

## H.    Breach of the Plea Agreement.

Kamon objected to the government's submission on the basis that it implicitly breached the plea agreement by endorsing the PSR's above-cap loss, submitting the trustee's statement and nearly double-cap allegations—including the $22,100,000

13

American Express claim, which was contrary to the government's own trial presentation—and using inflammatory characterizations to encourage a higher sentence. (2-ER-178.) In opposing the breach objection, the government acknowledged that it "did not argue that all of th[e American Express] charges were fraudulent during the trial of co-defendant Girardi," but nonetheless claimed no breach had occurred. (2-ER-172.)

## I. The Sentencing Hearing and Trustee "Victim Impact" Allocution.

The district court held a sentencing hearing on April 11, 2025. (1-ER-16.)

The breach claim. The court denied Kamon's objection, finding no breach, and emphasizing that the government made the express representation that it stood by the stipulations of the plea agreement. (1-ER-24, 26.)

The Guidelines calculation. The court grouped the counts under § 3D1.2(d) and applied the PSR's intended-loss measure over Kamon's Ex Post Facto objection. (1-ER-34-35.) The court limited the aggregated intended loss to approximately $19 million (the main fraud) to avoid double-counting, yielding the agreed plus-20 enhancement. (1-ER-46.)

As for enhancements, the court applied all four challenged count-specific enhancements to the grouped offense level over Kamon's objection. (1-ER-28-29.) For the main fraud, it applied 2-level enhancements for substantial economic hardship (1-ER-54-55) and for vulnerable victim, finding Kamon "knew or should

14

have known" the firm's personal injury clients were vulnerable, without any further finding that the at-issue victims were particularly susceptible to the offense. (1-ER-57.) The court also applied a 2-level enhancement for sophisticated means based on the main fraud, despite acknowledging Kamon's lack of direct involvement in the scheme's sophisticated aspects, and the side fraud based on his use of fake vendors and invoices. (1-ER-55-57.) With respect to the side fraud, it imposed a two-level enhancement to the grouped offense level for aggravated role, without resolving Kamon's factual objection that he did not supervise any co-schemers. (1-ER-57-58.) On mitigating role, the court concluded summarily: "I do not believe a mitigating role is appropriate for the main scheme for the reasons that I think I've already stated on the record a number of times." (*Id*.) After a three-level acceptance-of-responsibility reduction, the court calculated a total offense level of 32 and a Guidelines range of 121 to 151 months. (1-ER-58.)

The trustee's allocution. Over Kamon's objection, the government proffered the allocution of a single "victim": the bankruptcy trustee. (1-ER-61-63.) The court permitted the trustee to speak without independently analyzing whether she qualified as a victim, stating: "Once I'm assured that this person falls…within the scope of the Victim Rights Act, then that's the answer to the question." (1-ER-66.)

The trustee went on to give a lengthy statement right before the court imposed the sentence. She described the case as "horrible," recounted receiving calls from

15

clients who expected to recover "multimillions" but got far less, and characterized Kamon as exploiting "a situation that was out of control." (1-ER-67.) She also reiterated the allegation that Kamon spent "over $22,100,000" above the plea agreement cap, telling the court she had sued Kamon "for misuse of the American Express card"—despite the government's acknowledgment that those charges did *not* all result from fraud. (1-ER-70-71; 2-ER-172.) And she alleged additional conduct well outside the scope of the offense of conviction, including that Kamon paid a $120,000 Porsche lease from a client account in exchange for a release (1-ER-68); spent firm funds on Las Vegas parties and private-plane travel; was not cooperating with asset recovery; and did not genuinely accept responsibility. (1-ER-68, 70-71.)

The sentence. The court imposed a sentence of 121 months—the low end of the Guidelines range—to be served concurrently on both counts, followed by three years of supervised release. (1-ER-82.) In explaining the sentence, the court cited "the devastation wrought by this fraud on the client victims," as "evidenced by the victims' statements and testimony." (1-ER-73.)

## J. Girardi's Sentencing.

Girardi was sentenced on June 3, 2025, nearly two months after Kamon, by the same district court. (2-ER-143.) At sentencing, the government told the court that Girardi "hasn't stopped lying," sought to "hide behind" "allegations of mental

16

incompetence," and "tried to put all the blame" on Kamon. (2-ER-110-11.) Despite evidence that Girardi devised, directed, and concealed the main fraud for more than a decade, the government did not seek—and the court did not impose—sophisticated-means or aggravating-role enhancements. (2-ER-101, 106-18, 297-98.)

The district court refused to hear from the bankruptcy trustee, finding she was "not a victim in any legal practical factual sense" and "just a spectator" in the main fraud, and identifying the real victims as clients the firm could not pay. (2-ER-120.)

The court varied downward four levels for Girardi's age and medical conditions, imposing 87 months—34 months less than Kamon's 121 months—without addressing that disparity. (*See* 2-ER-132.)

This appeal follows.

## VII. SUMMARY OF ARGUMENT

Kamon's 121-month sentence—nearly 40% longer than the 87-month term imposed on Girardi, the self-described architect of the fraud—is riddled with error.

First, the district court permitted the Girardi Keese bankruptcy trustee to exercise statutory victim rights at sentencing, even though she was neither a "crime victim" nor a "lawful representative" under 18 U.S.C. § 3771. The Crime Victims' Rights Act ("CVRA") limits victim status to persons "directly and proximately harmed" by the offense, but the trustee suffered no direct loss and was not a qualified

17

statutory substitute for any victim. Her inflammatory presentation—urging the "maximum sentence" for "horrible" crimes, alleging unreliable losses nearly double the plea cap, underscoring the harm to clients, and undermining Kamon's acceptance of responsibility—swayed the district court, prejudicing Kamon. Kamon must therefore be resentenced, and the case assigned to a new district court. *See United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995); *United States v. Yamashiro*, 788 F.3d 1231, 1235-36 (9th Cir. 2015).

Second, the court committed a cascade of Guidelines errors. It violated the Ex Post Facto Clause by applying the 2024 version of § 2B1.1(b)(1) to calculate a 20-level loss enhancement based on "intended" loss of $19.4 million rather than actual loss of $2.3 million—a substantive change enacted to resolve a post-*Kisor* Circuit split that took effect only after Kamon's conduct ended. *See United States v. Banks*, 55 F.4th 246 (3d Cir. 2022); *Peugh v. United States*, 569 U.S. 530, 550 (2013). It then wrongly assumed that grouping under § 3D1.2(d) automatically authorized aggregating scheme-specific enhancements—adding eight levels without conducting the relevant-conduct analysis § 1B1.3 requires, despite different victims, conduct, and harms across the two schemes. *See United States v. Wilson*, 131 F.3d 1250, 1251-54 (7th Cir. 1997).

Compounding these errors, the district court applied an aggravating-role enhancement without resolving Kamon's factual objection—a Rule 32 violation

requiring *per se* reversal. *See United States v. Houston*, 217 F.3d 1204, 1208 (9th Cir. 2000). It then denied a mitigating-role adjustment without the five-factor analysis this Court's precedent demands, despite undisputed evidence that Kamon acted at Girardi's direction. *See United States v. Quintero-Leyva*, 823 F.3d 519, 523 (9th Cir. 2016). It also applied the vulnerable-victim enhancement based solely on the victims' categorical status as personal-injury clients, absent the individualized findings of unusual susceptibility the law requires. *See United States v. Castellanos*, 81 F.3d 108, 110-12 (9th Cir. 1996). Last but not least, it applied the sophisticated-means enhancement to conduct that fell far short of the required threshold—garden-variety falsified invoices, not the complex concealment methods the Guideline targets. *See* U.S.S.G. § 2B1.1(b)(10).

Third, the court failed to address Kamon's non-frivolous mitigation arguments—including his extensive cooperation and the stark sentencing disparity with Girardi—rendering his sentence procedurally unreasonable. *See United States v. Trujillo*, 713 F.3d 1003, 1009-10 (9th Cir. 2013).

Finally, the government's sentencing presentation—including its erroneous proffer of the trustee's inflammatory statements under the guise of "victim impact"—implicitly breached the plea agreement by conveying that the negotiated recommendation understated Kamon's culpability and the punishment he deserved. *See United States v. Farias-Contreras*, 104 F.4th 22 (9th Cir. 2024) (en banc).

19

For each of these reasons, independently and cumulatively, this Court should vacate Kamon's sentence and remand for resentencing.

## VIII. ARGUMENT

### A. The District Court Committed Layers of Reversible Error at Sentencing.

1. *The court erred by permitting the bankruptcy trustee—who was neither a "crime victim" nor a "lawful representative"—to exercise statutory victim rights.*

   a. Standard of Review

Whether a person qualifies as a "crime victim" or "lawful representative" entitled to exercise the rights conferred by the CVRA presents a question of statutory interpretation reviewed de novo. *See Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011, 1015-16 (9th Cir. 2006).

   b. The trustee's inflammatory sentencing presentation—urging the "maximum" sentence for Kamon's "horrible" crimes— was statutorily-unauthorized and undermined due process.

The right to be "reasonably heard" at sentencing under the CVRA, 18 U.S.C. § 3771(a)(4), belongs to the "crime victim," as that term is statutorily defined, or to the crime victim's "lawful representative," § 3771(d)(1). Here, the Girardi-Keese bankruptcy trustee satisfied neither statutory definition.

Whether the trustee qualified as a "crime victim" or a "lawful representative" under the CVRA was not a collateral question. It was the legal predicate for every aspect of the trustee's participation at sentencing, as the court squarely

20

acknowledged at both Kamon's sentencing hearing (in permitting the trustee to allocute) and Girardi's sentencing hearing (in prohibiting the trustee from allocuting). (*See* 1-ER-66; 2-ER-120.) Unless the trustee possessed statutory authority to invoke the CVRA, she had no right to submit victim-impact statements, no right to address the court, and no right to present victim-impact evidence.

The government repeatedly proffered the trustee's written statements and live allocution under the CVRA: it submitted the statements to Probation for inclusion in the PSR, attached her Kamon-specific statement to its sentencing memorandum, and offered her allocution at sentencing. (PSR-29-32; 1-ER-61, 66; 2-ER-270.) It told the court that the trustee was a CVRA "victim" and that her statement was "necessary" and "required," and the court in turn relied on that characterization over Kamon's objection in permitting her to exercise statutory victim rights. (1-ER-66; 2-ER-172-73.)

That was error. The CVRA limits "crime victim" status to "a person *directly and proximately* harmed as a result of the commission of a federal offense." 18 U.S.C. § 3771(e)(2)(A) (emphasis added). The statute thus makes direct and proximate causation to the claimant the threshold for victim status. *See In re Mikhel*, 453 F.3d 1137, 1139 & n.2 (9th Cir. 2006) (stating that CVRA defines victims by whether they were "directly and proximately harmed" by the offense). Here, there was no claim that the trustee suffered direct pecuniary loss. Her only connection to

the offense was administrative—appointment by the bankruptcy court after Girardi Keese's collapse. That is precisely the kind of derivative relationship the "directly and proximately harmed" requirement excludes.

The bankruptcy-fraud case the government relied upon below (*see* 2-ER-172), illustrates the point: a trustee does not become a victim simply by virtue of that office. In *United States v. Klassy*, 409 F. App'x 169 (9th Cir. 2011), the court treated the bankruptcy trustee as a "victim" because the trustee *personally* sustained an actual economic loss: his compensation depended on the size of the estate, and the defendant's concealment of estate assets reduced the fees payable to him. *Id.* at 172.[2]

Cases construing the materially-identical Mandatory Victim's Rights Act ("MVRA") definition, 18 U.S.C. § 3663A(a)(2), underscore the conclusion that a bankruptcy trustee is not a "crime victim" unless she can prove the same direct, personal, and proximately-caused harm demanded of every other claimant. In *United States v. Paradis*, 219 F.3d 22, 25 (1st Cir. 2000), for example, the court held that the trustee is not a victim of bankruptcy fraud under the MVRA where creditors,

---

[2]*United States v. Nazifpour*, 944 F.2d 472, 474 (9th Cir. 1991), cited by *Klassy*, points in the same direction. There, the defendant argued that the trustee, rather than the creditors, was the victim of his bankruptcy fraud. The court rejected the attempt to exclude the creditors because concealment of assets diminished the funds available to pay them, consistent with the conclusion that victim status follows the injury caused to the particular claimant and not merely the claimant's relationship to the bankruptcy estate. *See id.*

not the trustee, suffered losses. *Id.* at 25 (finding trustee was not a victim where defendant was convicted of money laundering and there was "no evidence that the trustee was harmed as a result of this offense"). *Singh v. Att'y Gen. of the U.S.*, 677 F.3d 503, 513-14 (3d Cir. 2012), likewise found it "unlikely" that the bankruptcy trustee "actually qualified as a victim under the MVRA" where the trustee "'did not expend any substantial additional resources as a result of the defendant's fraud.'" In contrast, *United States v. Holthaus*, 486 F.3d 451, 457-58 (8th Cir. 2007), and *United States v. Lowell*, 256 F.3d 463, 465-66 (7th Cir. 2001), involved direct, independent injury to the trustees themselves, such as uncompensated work, reduced compensation, or increased costs. *See also Singh*, 677 F.3d at 513, 516-17 (explaining that only "trustees whose 'compensation' has been 'negatively impacted'" are victims under the MVRA and discussing *Holthaus*, *Lowell*, and *Paradis* in support of the "identifiable loss" "metric that federal courts of appeals have used").

Here, because the trustee was not "directly and proximately" harmed, she was not a statutory "crime victim" and was not entitled to be heard at sentencing. *See* 18 U.S.C. § 3771(a)(4), (e)(2)(A). Nor was she entitled to be heard as the "lawful representative" of a crime victim, § 3771(d)(1), as the statutory language makes equally clear. Section 3771(e)(2)(B) permits a substitute to "assume the crime victim's rights" *only* "[i]n the case of a crime victim who is under 18 years of age,

23

incompetent, incapacitated, or deceased." *See also id.* § 3771(b)(2)(D) ("[T]he term 'crime victim' means the person against whom the [] offense is committed or, *if that person is killed or incapacitated*, that person's family member *or other lawful representative*.") (emphases added). A corporation that has filed for bankruptcy protection satisfies none of those criteria. The trustee therefore was not a qualified statutory substitute and had no right to be heard at sentencing on that basis either.

Consequently, the district court erred in considering the trustee's inflammatory written statements and live allocution. That error prejudiced Kamon. Although the trustee lacked the right to describe the offense's impact and express sentencing views on behalf of any victim, her iterative statements—including the lengthy allocution immediately before the court imposed the sentence—purported to do just that. As discussed above, she urged the "maximum sentence" for Kamon's "horrible" crimes, emphasized the "magnitude of the impact" of his conduct "far beyond the clients who have testified in this Court," underscored the damage to "hundreds of clients" who "deserve to see justice done," challenged his acceptance of responsibility, and introduced a host of new allegations—including the $22,000,000 American Express claim at odds with the trial evidence, which nearly doubled the plea agreement's loss cap. (PSR-29-32; 1-ER-67-71; 4-ER-446-48.) That deluge of incendiary and unreliable information swayed the district court, and contributed to the imposition of a significantly harsher sentence on Kamon than

24

Girardi, after barring the trustee from the latter sentencing proceeding altogether. (2-ER-120.)

Because prejudicial error rendered Kamon's sentencing fundamentally unfair, reversal is required. *See Hanna*, 49 F.3d at 577 (court violates a defendant's due process rights by relying upon materially unreliable information at sentencing); *Yamashiro*, 788 F.3d at 1235 (finding that, because victim statements "may influence the resulting sentence," "substantial rights of the defendant may be affected" and "significant prejudice" may arise from "what was said, how it was said, and how it was received by the court"). Upon remand, this case should be reassigned to a new district court—one who has not been exposed to the trustee's inflammatory and biased remarks. *See United States v. Quach*, 302 F.3d 1096, 1103-04 (9th Cir. 2002); *United States v. Johnson*, 187 F.3d 1129, 1136 (9th Cir. 1999).

> 2. *The district court erred in computing the Sentencing Guidelines.*

The Guidelines are "the starting point and the initial benchmark" for the district court's analysis under 18 U.S.C. § 3553(a) and a "district court commits procedural error if it fails to calculate (or improperly calculates) the Guidelines range...." *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc). Here, the district court's rulings—including application of a staggering plus-20 adjustment for "intended" loss, the automatic aggregation of count-specific enhancements to the grouped offense level, and its decisions on aggravating and mitigating role,

vulnerable victim, and sophisticated means—resulted in a Guidelines computation that was erroneous. Reversal is required.

### a. Standard of review

This Court reviews the district court's interpretation of the Sentencing Guidelines de novo, its application of the Guidelines to the facts of the case for abuse of discretion, and its factual findings for clear error. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc). This Court reviews Ex Post Facto challenges to sentencing decisions de novo. *United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997). A district court's compliance with Rule 32 is likewise reviewed de novo. *United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000).

### b. The court's application of a 20-level adjustment using the 2024 definition of "intended" loss violated the Ex Post Facto Clause.

"[T]he *Ex Post Facto* Clause forbids the [government] to enhance the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." *Peugh*, 569 U.S. at 550 (citation omitted); U.S.S.G. § 1B1.11 (court must apply Manual in effect on the date of the offense if the current Manual would create an Ex Post Facto violation). Yet that is what happened here. Using a harsher post-offense version of § 2B1.1(b)(1), the PSR computed Kamon's offense level by calculating the loss enhancement based upon *intended* loss of $19,436,985.34 rather than actual loss of $2,310,247.26—a difference of 4 levels in

26

the resulting Guidelines range.  (PSR-76, 99; U.S.S.G. § 2B1.1(b)(1).)  The court adopted that intended loss computation, applying a plus-20 adjustment to Kamon's base offense level rather than the lower plus-16 level adjustment that would have applied to actual loss.  (1-ER-45-46.)

At the time of Kamon's offense conduct, which ended in 2020, § 2B1.1 instructed the district court to "increase the offense level" "[i]f the loss exceeded" certain amounts.  The Guideline itself did not define "the loss exceeded" to include intended loss; rather, intended loss appeared only in the commentary accompanying the Guideline.  U.S.S.G. § 2B1.1 cmt. n.3(A) (2018) (providing in the commentary—not the Guideline text—that "[l]oss is the greater of actual loss or intended loss").  Over Kamon's objection on Ex Post Facto grounds, the court used the PSR's computation of intended loss based on the 2024 version of § 2B1.1, which moved "intended loss" from the commentary into the Guideline text, to increase his offense level for pre-2024 conduct.  U.S.S.G. § 2B1.1(b)(1), Notes to Loss Table, Note (A) (2024) (incorporating into the Guideline text the rule that "[l]oss is the greater of actual loss or intended loss").  (1-ER-39, 46; 2-ER-149.)

That was error, as the court explained in *Banks*.  "[L]oss" in the pre-2024 version of § 2B1.1 unambiguously means *actual* loss.  55 F.4th at 255-58.  Applying *Kisor v. Wilkie*, 588 U.S. 558 (2019), which held that agency commentary receives deference only if the underlying text is genuinely ambiguous, *Banks* concluded that

27

the Sentencing Commission exceeded its interpretive authority by expanding the Guideline through commentary to include intended loss. *Id.* Because the commentary enlarged rather than interpreted the Guideline's text, it was not entitled to controlling deference. *Id.*

It was in response to the post-*Kisor* Circuit conflict, including *Banks*, that the Commission amended § 2B1.1(b)(1) to move the intended-loss rule into the Guideline text. U.S.S.G. app. C, amend. 827, Reason for Amendment (2024) (effective Nov. 1, 2024). The amendment was thus enacted to restore uniformity, as the Commission explained—not because the old Guideline text already compelled intended-loss calculations. Indeed, had intended loss already been contained within the Guideline itself, there would have been no need to amend the Guideline's text. The amendment therefore substantively altered the operative Guideline language.

This Court has yet to decide whether it will follow *Banks*, but should do so now. Per *Banks*, before the 2024 Guidelines amendment, loss meant "actual loss," and the commentary purporting to expand that unambiguous definition is *ultra vires*. 55 F.4th at 255-58. Because the district court applied a substantive expansion of § 2B1.1 that became effective only after Kamon's offenses were completed, the resulting 20-level increase in his advisory Guidelines range violated the Ex Post Facto Clause. *See Peugh*, 569 U.S. at 550.

Kamon's sentence must therefore be reversed.

28

     c.   <u>Grouping under § 3D1.2(d) did not authorize the court's automatic aggregation of count-specific enhancements to the total offense level without first applying § 1B1.3's relevant-conduct rule.</u>

Beyond "intended" loss, the court committed reversible errors in calculating the applicable adjustments and enhancements. After finding that Kamon's main- and side-fraud convictions grouped under § 3D1.2(d), the court simply assumed, over Kamon's objection, that adjustments and enhancements arising from *either* fraud scheme *automatically* aggregated and applied to the grouped offense level. (1-ER-28-29 ("If grouping is appropriate then … [i]t doesn't matter whether it applies to the main scheme or the side scheme.")). The court's approach resulted in the aggregation to the grouped offense level of eight levels of enhancements for substantial financial hardship and vulnerable victim (found to arise out of Kamon's main fraud conduct *only*) and sophisticated means and aggravated role (found to arise out of Kamon's side fraud conduct *only*). (*See* PSR-101, 103; 1-ER-46-47.) That was error.

Neither § 1B1.3 nor § 3D1.3 authorized the district court's automatic aggregation of count-specific enhancements to the total offense level. Rather, in computing the total offense level under § 3D1.3(b), the court was required to determine whether the conduct supporting the main- and side-fraud enhancements constituted relevant conduct to the other scheme under § 1B1.3(a)(2)—specifically, whether the conduct was "part of the same course of conduct or common scheme or

29

plan as the offense of conviction." Neither the government nor the PSR took the position that the conduct supporting any of the four enhancements met the relevant-conduct test. (*See* PSR-72; 2-ER-241.) The court did not make any such finding either. (1-ER-14.) But such a finding was required before aggregating losses attributable to one scheme and not the other.

The text of the Guidelines makes clear that grouping does not *automatically* make conduct associated with only one scheme a basis for enhancing the combined offense level. Section 1B1.3 begins with the mandate that every Chapter Two specific offense characteristic and every Chapter Three adjustment "*shall* be determined" on the basis of the conduct made relevant by § 1B1.3 unless an enhancement provides otherwise. U.S.S.G. § 1B1.3(a) (emphasis added). For offenses that group under § 3D1.2(d), an act must be "part of the same course of conduct or common scheme or plan as the offense of conviction" for it to constitute relevant conduct on which Chapter Two offense characteristics or Chapter Three adjustments may rest. U.S.S.G. § 1B1.3(a)(2).

Section 3D1.3 incorporates, rather than displaces, that requirement in prescribing the method for calculating the grouped offense level. Where multiple counts charging the same offense group under § 3D1.2(d), § 3D1.3(b) directs that "the offense level applicable to a Group is the offense level corresponding to the

30

aggregated *quantity . . . determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three*." U.S.S.G. § 3D1.3(b) (emphasis added).

Section 3D1.3(b) thus directs courts to "aggregate *quantity*" only in computing the grouped offense level—here, loss. It does not instruct courts to aggregate Chapter Two offense characteristics and Chapter Three adjustments. To the contrary, it states expressly that the grouped offense level must be "determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three." *See Bowe v. United States*, 146 S. Ct. 447, 463 (2026) ("we presume differences in language like this convey differences in meaning") (cleaned up). Chapter Two offense characteristics and Chapter Three adjustments, in turn, must "be determined" on the basis of relevant conduct pursuant to § 1B1.3(a)(2). U.S.S.G. § 1B1.3(a)(2).

Nothing in the text of § 3D1.3(b) overrides § 1B1.3(a) to authorize the automatic aggregation of count-specific enhancements to the grouped offense level. Put differently, if aggregating "quantity" under § 3D1.3(b) already carried with it authority to aggregate automatically every Chapter Two and Chapter Three enhancement arising from any grouped count, § 1B1.3's relevant-conduct framework would be rendered mere surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[A] statute ought, upon the whole, to be so construed that … no clause, sentence, or word shall be superfluous.") (cleaned up). Section 3D1.3(b)

31

therefore changes only the method for calculating quantity—not the substantive standards governing adjustment and enhancement eligibility.

A comparison with neighboring § 3D1.3(a) reinforces that conclusion. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (words of a statute must be read in their context and with a view to their place in the overall statutory scheme). Section 3D1.3(a), which applies to counts grouped under § 3D1.2(a)-(c), directs the court to select the offense level for "the most serious of the counts comprising the Group," but like § 3D1.3(b), instructs that it be "determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three." U.S.S.G. § 3D1.3(a). Had the Sentencing Commission intended § 3D1.2(d) grouping to trigger a fundamentally different substantive methodology for applying enhancements than § 3D1.2(a)-(c) grouping under § 3D1.3—particularly one that would override § 1B1.3(a)'s predicate relevant-conduct test—the Guideline would say so expressly.

The commentary further confirms that conclusion. Section 1B1.3's commentary explains that "although Chapter Three, Part D (Multiple Counts) applies to multiple counts of conviction, it does not limit the scope of subsection (a)(2)," which requires the finding that an act was "part of the same course of conduct or common scheme or plan as the offense of conviction" for it to constitute relevant conduct. U.S.S.G. § 1B1.3 cmt. n.5. And § 3D1.3's commentary instructs that courts should "[d]etermine *whether* the specific offense characteristics or

32

adjustments from Chapter Three, Parts A, B, and C apply based upon the combined offense behavior taken *as a whole*." U.S.S.G. § 3D1.3 cmt. n.3 (emphases added).

The instruction to determine "whether" enhancements apply itself refutes the district court's assumption that grouping automatically authorized the aggregation of eight levels in enhancements to the total offense level. The question is *if* the enhancements apply. The answer turns on the "combined offense behavior taken as a whole." While the commentary does not define "taken as a whole," the Guidelines answer that question. Because § 1B1.3 governs Chapter Two offense characteristics and Chapter Three adjustments, "taken as a whole" is naturally understood to mean the offense of conviction together with acts qualifying as relevant conduct—namely, conduct found to be "part of the same course of conduct or common scheme or plan as the offense of conviction." *See* U.S.S.G. § 1B1.3(a)(2). *See United States v. Kirilyuk*, 29 F.4th 1128, 1134-35 (9th Cir. 2022) (commentary cannot expand an unambiguous Guideline).

*United States v. Wilson*, 131 F.3d 1250, 1251 (7th Cir. 1997), is instructive. There, the Seventh Circuit considered the defendant's second appeal after it had vacated his sentence initially upon finding that his mail fraud and money laundering convictions should have grouped under § 3D1.2(d). *Id.* On remand, the district court—as here—assumed that grouping *automatically* permitted it to treat count-specific Chapter Two offense characteristics and Chapter Three adjustments as

applicable to the Guideline computation for different counts under § 3D1.2(d). *Id.* at 1251-52. The Seventh Circuit rejected that reasoning and confirmed that grouping and relevant conduct are distinct inquiries. Construing § 3D1.3(b) and its commentary—specifically, the dictate that offense characteristics and adjustments must be determined "based upon the combined offense behavior taken *as a whole*"— the court held that "the specific offense characteristics and adjustments are to be applied by considering the offense of conviction *and all relevant conduct*." *Id.* at 1252-53 (emphases added). The grouping determination did not itself thus establish that the relevant-conduct criteria were satisfied—the two inquiries are separate.[3] *Id.*

Here, the district court was required to determine whether the conduct supporting each count-specific enhancement for one scheme satisfied § 1B1.3(a)(2)'s test for the other scheme—namely, whether it was "part of the same course of conduct or common scheme or plan as the offense of conviction"—before importing it into the grouped offense. It failed to do so. As a result, the grouped offense level was calculated under an erroneous interpretation of § 1B1.3 and §

---

[3] *United States v. Cueto*, 9 F.3d 1438, 1441 (9th Cir. 1993), does not hold otherwise. *Cueto* did not construe the text of § 3D1.3(b), nor address whether grouping automatically displaces § 1B1.3—the question presented here and resolved in *Wilson*. Instead, *Cueto* relied summarily and exclusively on the commentary, rather than the text. *See id.* But commentary cannot contradict text, and *Beaird v. United States*, No. 25-5343 (cert. granted Apr. 20, 2026), will address whether *Stinson v. United States*, 508 U.S. 36 (1993), "still correctly states the rule for the deference that courts must give the commentary to the Sentencing Guidelines."

34

3D1.3. That error prejudiced Kamon. Even if the enhancements at issue were in fact applicable to the main fraud or the side fraud, which Kamon disputes, the conduct did *not* satisfy the relevant conduct test—a fact the government *never* disputed. The schemes involved different victims, different accomplices, different criminal objectives, different methods of execution, and, as the government admitted, "the harm to Girardi Keese from the side fraud [wa]s *separate and distinct* from the harm suffered by the firm's clients due to the main fraud." (2-ER-260 (emphasis added).) Neither scheme was relevant conduct to the other.

Because the district court erroneously aggregated eight levels of enhancements for conduct that did not meet § 1B1.3's relevant-conduct test, Kamon's sentence must be reversed.

> d. <u>The district court's application of an aggravating role enhancement, and denial of a mitigating role adjustment, was erroneous.</u>

Even if the court was permitted to aggregate enhancements that applied to *only* the main fraud *or* the side fraud in computing the grouped offense level, it erred in its various rulings on the adjustments applicable to each scheme. In particular, the court applied an aggravating-role enhancement based on the side fraud without resolving the predicate factual disputes—as Rule 32 requires—and refused Kamon's request for a mitigating-role adjustment in connection with the main fraud without

35

performing the requisite comparative-culpability analysis. Each error is addressed below.

> i. *The court failed to resolve a key factual dispute, as Rule 32 required, before applying an aggravating role enhancement.*

Over Kamon's objection, the district court added a 2-level aggravating role enhancement under § 3B1.1(c), applicable to defendants who are "an organizer, leader, manager, or supervisor" to account for his participation in the side fraud. (PSR-102-03; 1-ER-49-51, 57; 2-ER-274.) In doing so, the court failed to address Kamon's factual objections to the PSR in contravention of Rule 32.

Federal Rule of Criminal Procedure 32 requires sentencing courts to resolve all factual dispute relevant to sentencing, or "clearly state that the disputed fact was not taken into account." *Carter*, 219 F.3d at 867. This Circuit mandates "strict compliance" with Rule 32, and the district court's rulings on any factual dispute material to sentencing "must be 'express' or 'explicit.'" *Houston*, 217 F.3d at 1208. "It is well settled … that when the district court fails to make the required Rule 32 findings or determinations at the time of sentencing, [the Court] must vacate the sentence and remand for resentencing." *Carter*, 219 F.3d at 866 (cleaned up).

Section 3B1.1 requires proof that the defendant exercised authority over another criminal *participant*, not merely that he played an important role in the offense or organized criminal activities. There must be a showing that the defendant

36

"had control over" other participants or "organized other participants" for the purpose of carrying out the charged crimes. *United States v. Holden*, 908 F.3d 395, 402-03 (9th Cir. 2018) (cleaned up). A defendant "organizes" participants only if he possesses "the necessary influence and ability to coordinate their behavior so as to achieve the desired criminal results." *Id.* at 402 (cleaned up). "[M]ere *facilitation* of criminal activity is not sufficient," "[n]or is it sufficient for a defendant to have organized property or activities—the defendant must have organized *participants*." *Id.* (citation omitted).

Here, Kamon objected to the enhancement on this very ground. (1-ER-49-51.) He told the court that "there is no indication that Mr. Kamon led this or that he engaged in this scheme by directing others." (*Id.*) Rather, "[o]thers were involved, but not because he was directing them, *because they were already participating*." (*Id.* (emphasis added).) Kamon also described for the court the specific evidentiary basis for that claim: one of the participants "was collecting money on checks going back to 2011" and "it wasn't in conjunction or in combination with Mr. Kamon," and the other participant "made [payments] with the knowledge and the approval of Mr. Girardi." (1-ER-50-51.) Yet the court never resolved the disputed factual question of whether these participants were acting under Kamon's direction, or whether they acted independently, as he maintained—the key issue for the enhancement. Absent such a finding, the enhancement was inapplicable.

37

The court's failure to comply with Rule 32 mandates *per se* reversal.

      ii.    *The court failed to compare Kamon's conduct to Girardi's, or to sufficiently state its reasons, before declining to apply a mitigating role adjustment.*

Over Kamon's objection (1-ER-51; 2-ER-274), the court also declined to apply the 2-level mitigating role adjustment under § 3B1.2 to his conduct in connection with the main fraud, stating in conclusory fashion: "I do not believe a mitigating role is appropriate for the main scheme for the reasons that I think I've already stated on the record a number of times." (*See* 1-ER-57-58.) That was error for two reasons.

First, the court failed to conduct the requisite analysis of relative culpability. Section 3B1.2 mandates a mitigating-role adjustment for defendants who are "substantially less culpable" than the average participant in criminal activity. U.S.S.G. § 3B1.2 cmt. n.3(A). This Court has held that, in determining whether to apply a minor role reduction, sentencing courts "must consider" five non-exclusive factors: (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation, including the discretion exercised; and (5) the degree to which the defendant stood to benefit. *United States*

38

*v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018) (quoting U.S.S.G. § 3B1.2, cmt. n.3(C));

*see also Quintero-Leyva*, 823 F.3d at 523-24. Remand for resentencing is warranted

where the record is "unclear as to whether the court considered *all* of the factors,"

even if "the district court considered many factors" in deciding whether to grant the

role reduction. *Id.* (reversing and remanding for resentencing with instruction that

the court consider all five factors) (emphasis added).

Here, like in *Quintero-Leyva*, remand is required because the court's

conclusory rejection of Kamon's position fails to demonstrate consideration of the

relevant factors and is insufficient for meaningful appellate review. *See id*; *see also*

*Diaz*, 884 F.3d at 916 (while the district court need not "tick off the factors," the

record must show that it "considered them"); *Trujillo*, 713 F.3d at 1009 (district

court has a "duty to provide a sufficient explanation of the sentencing decision to

permit meaningful appellate review").

Moreover, had the court applied the correct comparative standard, Kamon

would have been entitled to the reduction because all five factors weigh in his favor.

First, Kamon had no client or case-specific involvement beyond accounting;

Girardi—not Kamon—designed and controlled the enterprise, negotiated

settlements, controlled the trust accounts, determined which client funds to

misappropriate, and lied to clients. (PSR-17-18; 2-ER-229-30, 291, 293-94, 334.)

Second, Kamon did not plan or organize the fraud but at all times carried out

39

Girardi's directions. (PSR-17-18; 2-ER-229-30, 294.) Third, Girardi exercised virtually all decision-making authority. (*See id.*) Fourth, although Kamon performed important financial functions, performing an "essential" or "indispensable" role does not disqualify a defendant from a mitigating adjustment. *See Quintero-Leyva*, 823 F.3d at 523 (cleaned up); *see Diaz*, 884 F.3d at 917 (cleaned up). Fifth, Girardi was the primary beneficiary, while Kamon's financial stake was comparatively limited. *See id.* at 916.

That comparison—between Girardi, who originated and directed the criminal enterprise, and Kamon, who followed instructions as to one aspect of the scheme— is precisely the type that § 3B1.2 requires the court to make. Failure to do so was error. The prejudicial effect of that error is particularly stark given that Girardi did not receive an aggravating role enhancement, effectively placing him on equal footing with Kamon despite their vastly different roles. (*See* 2-ER-101.)

Because the district court erred in refusing to apply a mitigating role adjustment, Kamon's sentence must be reversed.

> e. <u>The court erred in applying the vulnerable victim enhancement for "personal injury clients" without the requisite finding they were unusually susceptible to the crime.</u>

The district court also erred in applying the vulnerable victim enhancement absent finding that the scheme's victims were unusually susceptible to the offense conduct.

40

Section 3A1.1(b)(1) provides for a two-level enhancement only where the district court makes particularized findings that the victim was "unusually vulnerable" or "particularly susceptible" to the offense and the defendant knew or should have known that. U.S.S.G. § 3A1.1(b)(1), cmt. n.2. "A victim is unusually vulnerable when she is less able to resist than the typical victim of the offense of conviction." *United States v. Nielsen*, 694 F.3d 1032, 1035-36 (9th Cir. 2012) (victim's "sex and drug use, boredom, and her inclination to get away from her divorced parents" may have made her more vulnerable than the general population but were typical of Mann Act victims, and thus the vulnerable-victim adjustment did not apply) (cleaned up).

"It is not enough to support a finding of particular susceptibility under § 3A1.1 that the victim is more likely than other members of the *general population* to become a victim to the particular crime at issue." *Id.* (cleaned up) (emphasis added). "If the factor that makes the victim vulnerable is not 'unusual' for victims *of the offense*, the § 3A1.1(b)(1) enhancement is not permitted." *United States v. Castaneda*, 239 F.3d 978, 981 (9th Cir. 2001) (Mann Act victims who were low income and lacked financial resources not "vulnerable victims" because "economic vulnerability[, while] not always associated with victims of a Mann Act violation, [is] typically associated with such an offense") (emphasis added). The enhancement

41

therefore requires individualized findings concerning the victim's unusual susceptibility, not characteristics common to every victim of the offense.

This Court has applied the vulnerable victim enhancement's requirement of unusual susceptibility to law firm clients. In *United States v. Castellanos*, 81 F.3d 108, 110 (9th Cir. 1996), for example, the defendant ran a fraudulent investment scheme that targeted Spanish-speakers, advertised in Spanish-language media, and marketed itself as a "proudly Hispanic" company. The district court applied the enhancement based on the victims' shared ethnicity and language. *Id.* This Court reversed, holding that those facts were insufficient "to support a finding of particular susceptibility under § 3A1.1," reasoning that "the appellate courts have consistently refused to find a class of victims to be particularly susceptible to criminal conduct simply because they were statistically more likely to fall prey to the defendant's crime." *Id.* at 110-11. In other words, a finding of shared group membership, without more, cannot support the enhancement. *Cf. United States v. Matsumaru*, 244 F.3d 1092, 1106-09 (9th Cir. 2001) (distinguishing *Castellanos* and holding not clear error to apply enhancement where district court relied on a host of "different and additional factors" to find clients were particularly susceptible).

Here, the court applied the enhancement over Kamon's objection because "[h]e knew that *the clients of the firm* were vulnerable victims … when money that was supposed to go to allowing them to lead normal lives again was instead put into

42

the pockets of Girardi-Keese or himself." (1-ER-57 (emphasis added)); *see also* (PSR-39) ("the victim clients were vulnerable … by virtue of their *status as victims who suffered personal injury and sought assistance from attorneys*") (emphasis added). But the victims' categorical status as personal injury clients did not, alone, make them more susceptible than the ordinary victim of the offense. *See Castaneda*, 239 F.3d at 981; *Nielsen*, 694 F.3d at 1035-36. The district court was required to make individualized findings demonstrating their unusual susceptibility—findings the court failed to make.

Because the district court identified no individualized characteristics that rendered the specific clients in question unusually susceptible, nor did it make any finding that the scheme targeted those clients as particularly vulnerable, it was clear error to apply the enhancement. Kamon's sentence must be reversed.

> f. <u>The court erred in applying the sophisticated means enhancement to conduct that failed to demonstrate the requisite sophistication.</u>

Section 2B1.1(b)(10)(C) authorizes a two-level enhancement where the offense "otherwise involved sophisticated means" *and* "the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Over Kamon's objection, the court found that the enhancement applied to the grouped offense level based on both the main and side fraud schemes. That was error twice over.

43

First, the court found that "the main scheme used sophisticated means," although it did not apply the enhancement to Girardi, and acknowledged that Kamon was not directly involved in the sophisticated aspects of the scheme. (2-ER-101; *cf.* 1-ER-55-57 ("*Whether Mr. Kamon had direct involvement* in that aspect of the scheme," the court found, "*I don't know that that's relevant* because, as I've said, I've grouped the two schemes together here[.]") (emphasis added.). Contrary to the court's conclusion, Kamon's "direct involvement"—namely, whether he "intentionally engaged [in] or caused" sophisticated fraud, as the text of the Guideline requires—was the touchstone of the inquiry, absent which the enhancement did not apply. *See United States v. Terabelian*, 105 F.4th 1207, 1219 (9th Cir. 2024) ("[F]or the enhancement to apply, the defendant *herself* must have 'intentionally engaged in or caused the conduct constituting sophisticated means.'") (quoting U.S.S.G. § 2B1.1, amend. 792) (emphasis added).

Second, the court found that the side fraud also used sophisticated means because Kamon "had certain co-schemers who posed as vendors" and "caused the fake vendors to issue fraudulent invoices to Girardi-Keese for purported goods and services," which in turn allowed him "to hide the true purpose for the payments and transactions[.]" (1-ER-55-57.) But as the text of the Guideline makes clear, the use of fake invoices to carry out a fraud scheme does not even approach the threshold showing for sophisticated means.

44

Section 2B1.1(b)(10)(C) is the residual clause at the end of a three-part series, providing for a two-level enhancement where:

(A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials;

(B) a substantial part of a fraudulent scheme was committed from outside the United States; or

(C) the offense *otherwise involved sophisticated means* and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

U.S.S.G. § 2B1.1(b)(10)(A-C) (emphasis added). The residual clause—"otherwise involved sophisticated means"—must be interpreted by asking how it is "linked to its surrounding words," while giving effect to "every clause and word," and considering both the provision's specific context and the statute as a whole. *See Fischer v. United States*, 603 U.S. 480, 486-89 (2024) (construing a neighboring statutory subsection that likewise begins with "otherwise"). The "otherwise" provision is "limited by the preceding list," because Congress would not "go to the trouble of spelling out the list" if the catchall swallowed it. *Id*. at 489-90.

Applying that reasoning, it is clear that garden-variety fraud like Kamon's side fraud does not involve sophisticated means. Subsections (A) and (B) identify

45

unusual structural or jurisdictional methods—relocating a scheme to evade authorities or operating substantially abroad. Under the canon of *ejusdem generis*, a residual term following specific provisions reaches conduct sharing their relevant attributes; *noscitur a sociis* likewise gives "sophisticated means" meaning from its statutory neighbors. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001); *Yates v. United States*, 574 U.S. 528, 545-46 (2015). Applying those cannons, "otherwise" sophisticated conduct must involve extraordinary evasion or obfuscation. The whole-text and anti-surplusage canons confirm that result: treating ordinary false paperwork as sophisticated means would leave (A) and (B) little work to do and read "otherwise" out of (C). *See Fischer*, 603 U.S. at 486-90. Section 2B1.1(b)(10)(C) must therefore reach other methods comparable in kind and degree to the structural, jurisdictional, and operational sophistication specified in (A) and (B)—not false paperwork that is the mechanism of ordinary frauds.

The commentary confirms these textual limitations. It defines "sophisticated means" as "*especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of an offense," then supplies examples: dividing a telemarketing operation between jurisdictions and "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1 cmt. n.9(B) (emphasis added). Ordinary false invoices

46

are different in kind from these exemplars. They are the *actus reus* of fraud, not extraordinary means of hiding fraudulent conduct.

Ninth Circuit cases construing the sophisticated means enhancement likewise confirm the conclusion that Kamon's side-fraud conduct did not approach the level of sophistication required. In *United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014), the court relied not on invoices alone but on "dozens of various acts" "used to execute and conceal three types of fraud," including altered invoices, falsified checks, and manipulated accounting records. In *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013), the scheme created a complicated fabricated paper trail to induce and conceal fraudulent lending. And in *United States v. Augare*, 800 F.3d 1173, 1175-76 (9th Cir. 2015), the defendants used coordinated, circular transfers through multiple accounts to disguise the source and destination of funds.

Kamon's conduct bears no resemblance. Kamon submitted false invoices created by third parties. He did not use complex means to hide his fraud, nor a complicated fabricated paper trail, nor coordinated circular transfers through multiple accounts. The sophisticated means enhancement therefore never should have applied to the side fraud, and plainly did not apply to the main fraud based on Kamon's conduct—as the district court belatedly concluded in sentencing Girardi.

Because Kamon's misconduct was not "especially complex or especially intricate," the district court erred in applying the enhancement and his sentence must be reversed.

    3.    *The court's failure to consider mitigation evidence, when considered cumulatively with the balance of the errors, rendered Kamon's 121-month sentence procedurally unreasonable.*

    a.  <u>Standard of Review.</u>

This Court reviews the district court's sentencing decision for procedural reasonableness. *Carty*, 520 F.3d at 993. A sentence is procedurally unreasonable where, *inter alia*, the district court fails to adequately explain the sentence. *United States v. Blinkinsop*, 606 F.3d 1110, 1114 (9th Cir. 2010).

    b.  <u>The court erred procedurally when it ignored mitigation critical to its evaluation of the § 3553(a) factors.</u>

"When a defendant requests a specific departure from the Guidelines-recommended sentence, the district court must explain its decision to reject the request." *United States v. Laurienti*, 731 F.3d 967, 975 (9th Cir. 2013) (citing *United States v. Apodaca*, 641 F.3d 1077, 1081 (9th Cir. 2011)). The explanation must "set forth enough to satisfy the appellate court that [the district court] considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decision[-]making authority." *Id.* (alterations in original, citation omitted). In particular, a specific explanation is required where defense counsel "presents

48

nonfrivolous reasons for imposing a different sentence[.]" *Carty*, 520 F.3d at 992-93.

In *United States v. Trujillo*, the court reversed and remanded where the district court failed to address the defendant's mitigation arguments, including that a lengthy sentence would create an unwarranted disparity with similarly-situated individuals. 713 F.3d at 1009-10. The court found that the district court's "total omission" in failing to state a reason for rejecting his nonfrivolous arguments went against *Rita. Id.* (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)). *Rita* requires not just "*consideration*" of a nonfrivolous argument, but "*explanation*" of the decision to reject it, such that "appellate courts and the public have an adequate basis for concluding that sentencing occurred in a reasonable fashion." *Id.*

Kamon presented nonfrivolous mitigation arguments: his five proffers and substantial cooperation with the government, and the disproportionality of a 121-month sentence relative to the government's 168-month recommendation for Girardi, the scheme's architect. (2-ER-217; PSR-32-36.) Like in *Trujillo*, Kamon was entitled to a reason why the district court rejected these arguments in mitigation. But the district court failed even to acknowledge them, let alone give the minimum explanation that *Rita* requires. That rendered his sentence procedurally unreasonable.

Girardi's proceedings confirm that conclusion. Unlike Kamon—who acted at

49

the direction of Girardi and was involved only in the accounting aspect of the main fraud scheme, proffered five times, pleaded guilty and accepted responsibility—Girardi took a different tack. (PSR-15, 17-18, 29-32; 2-ER-229-30, 291, 293-94.) The undisputed "architect and driver" and primary beneficiary of the main fraud scheme went to trial, lied under oath in his trial testimony, and denied culpability in his sentencing allocution. (2-ER-110-11.) Despite Girardi's aggravated conduct, after applying a 4-level departure for his medical condition, the district court sentenced Girardi to an 87-month term—nearly 40% lower than the 121-month sentence previously imposed on Kamon. The court did not attempt to reconcile that disparity, nor explain why the leader of the main fraud scheme ultimately received substantially less imprisonment than a subordinate participant. (*See* 2-ER-132) (stating, in conclusory fashion, "[o]ther than his age and health, Mr. Girardi is similarly situated to his co-defendant, Mr. Kamon, in many material respects, although Mr. Girardi, not Mr. Kamon, was a lawyer, who should have known better.").

Given the district court's "total omission" of the reason why it rejected his request for a variance based on this mitigation, Kamon's sentence must be reversed. *See Trujillo*, 713 F.3d at 1010.

50

4.       *The cumulative effect of the court's errors warrants reversal.*

"Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal." *United States v. Inzunza*, 638 F.3d 1006, 1024 (9th Cir. 2011). "Where, as here, there are a number of errors …, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors …." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (citation omitted). The cumulative effect of the errors addressed above was to deprive Kamon of a fair, considered, constitutional, and procedurally reasonable sentence. As such, even if this Court finds that no error alone mandates reversal, Kamon must nonetheless be resentenced.

**B.       The Government's Implicit Breach of the Plea Agreement— Including Through Its Repeated Proffer of the Trustee's Statutorily-Unauthorized Sentencing Presentation—Warrants Resentencing.**

The government's sentencing position implied that the "true" Guidelines calculations exceeded those reflected in the plea agreement—undermining Kamon's acceptance of responsibility—and portrayed the agreed-upon calculations as negotiated concessions. What is more, the government submitted and endorsed the highly-inflammatory statements (both written and oral) of the bankruptcy trustee under the guise of a victim-impact statement, although she was not a victim under well-established law. The government's implicit message was clear: the plea

51

agreement understated Kamon's culpability and the district court should impose a higher sentence.

      1.    *Standard of Review*

This Court reviews de novo a claim that the government has breached its plea agreement. *Farias-Contreras*, 104 F.4th at 27 (en banc).

      2.    *The government's implicit breach of the plea agreement permits this Court to reach the merits of Kamon's appeal and independently requires resentencing before a different court.*

Because plea agreements induce the waiver of fundamental constitutional rights, the government must strictly comply with both the letter and the spirit of its promises. A promise concerning sentencing advocacy may be breached implicitly, and the government may *not* formally recite the agreed position while presenting material that serves no practical purpose except to encourage a harsher sentence. *Farias-Contreras*, 104 F.4th at 28-31 (en banc); *United States v. Heredia*, 768 F.3d 1220, 1231-34 (9th Cir. 2014); *United States v. Whitney*, 673 F.3d 965, 970-73 (9th Cir. 2012).

The implicit breach doctrine prohibits the government from emphasizing material merely to aggravate the sentencing picture, introducing inflammatory information irrelevant to any matter it remains free to argue, or otherwise "winking at the district court" while nominally making the promised recommendation. *Farias-Contreras*, 104 F.4th at 28-31; *Whitney*, 673 F.3d at 971-73; *Heredia*, 768

52

F.3d at 1231. Courts examine alleged breaches objectively and in context to determine whether the substance, purpose, and tone of the government's overall sentencing presentation was consistent with the defendant's reasonable understanding of the bargain—not whether the prosecutor can identify words of literal compliance. *See Heredia*, 768 F.3d at 1230-31; *United States v. Mondragon*, 228 F.3d 978, 980-81 (9th Cir. 2000).

*United States v. Johnson*, applied the implicit breach rule squarely to victim-impact submissions. There, the government promised to recommend the low end of the Guideline range but introduced the statement of a former wife (an ostensible "victim") calling the defendant a "monster" in connection with an unrelated domestic-violence offense. 187 F.3d at 1135. The statement did not concern the charged offense, did not support a Guideline adjustment, and could serve only as a reason to choose the high end. *Id.* at 1135 & n.5. This Court held that introducing the statement "solely for the purpose of influencing the district court to sentence Johnson more harshly" breached the plea's promise. *Id.* at 1135-36.

Here, Kamon's plea agreement committed the government not to contest the stipulated facts and Guideline computation—including the agreed-upon loss amount and Kamon's acceptance-of-responsibility—and to recommend a low-end advisory Guideline sentence. (2-ER-312-13, 317.) The government's sentencing presentation nominally recommended that he get the benefit of his bargain as to each

53

of these required aspects of the plea agreement; however, viewed as a whole—as this Court's plea-breach holdings require—it consistently conveyed to the court that the negotiated recommendation understated the seriousness of the offense, the loss amount, and the punishment the government believed Kamon deserved.

The government called Kamon's conduct "brazen," described him as the "gatekeeper" in the main fraud and the "mastermind" of the side fraud, compared him to Girardi in his "same cynical, devious, and cavalier approach," and told the court his conduct warranted a "significant custodial sentence," while highlighting unrelated pending charges.  (2-ER-246-47, 256, 258, 264.)

The government likewise framed the Guidelines calculation as more severe than the plea agreement allowed.  It started with a full-page summary of the PSR's computation and then said it "agrees with Probation's conclusion that the total offense level is 32 but reaches that level by slightly different calculations," while noting that its capped figure omitted "additional loss."  (2-ER-253-54.)  The PSR's total offense level depended on an above-cap loss figure and a plus-22 loss enhancement (PSR-99-100), and the government's presentation made clear that the negotiated loss understated actual loss.  The government also emphasized that, despite Kamon's acceptance of responsibility, he had made efforts to impede liquidation of his assets.  (2-ER-265.)  The unmistakable implication was that the

54

plea agreement understated the seriousness of the offense and that the government believed the actual Guidelines calculation was more severe.

The centerpiece of the implicit breach was the government's repeated submission and endorsement of the trustee's statements, which urged the "maximum sentence," called Kamon's crimes "horrible," and questioned his acceptance of responsibility. It submitted the statement to Probation, attached it to its memorandum, and proffered the trustee's live allocution while calling the submission "required" and "necessary" under the CVRA. As described in Section VIII(A)(1), the trustee also introduced a host of new allegations, including the $22,000,000 American Express claim that nearly doubled the plea cap, which was repeated during the trustee's allocution despite the government's acknowledgment that its trial evidence refuted the notion that the charges were all fraud. (PSR-29-32; 1-ER-61-66; 2-ER-172-73; 4-ER-446-48.)

Because the trustee was neither a "crime victim" nor a "lawful representative" of such a victim under 18 U.S.C. § 3771, *see* Section VIII(A)(1), the government had no basis to present her advocacy as the authorized voice of any victim. By invoking the CVRA to place highly inflammatory statements and allegations exceeding the plea agreement before the court, it conveyed indirectly that the negotiated recommendation was too lenient.

Viewed cumulatively, the government's sentencing presentation mirrors the "wink and nod" condemned by this Circuit's implicit-breach jurisprudence. The government may not technically utter the promised recommendation while simultaneously furnishing the district court with arguments, facts, and advocacy designed to persuade it that a substantially harsher sentence is warranted. Nor does it matter whether the government subjectively intended to circumvent the plea agreement by proffering the trustee as a victim or making any other aspect of its sentencing presentation. *See Santobello v. New York*, 404 U.S. 257, 262 (1971) (inadvertent breach required vacatur because "[t]hat the breach of agreement was inadvertent does not lessen its impact"); *United States v. Alcala-Sanchez*, 666 F.3d 571, 575-76 (9th Cir. 2012) (explaining that it does not matter that the breach was inadvertent, the product of mistake, the result of internal miscommunication, or that the government corrected its mistake and recommended the agreed-upon sentence before the hearing).

The appropriate remedy is the one prescribed by both *Santobello* and this Circuit's precedent. When the government breaches a plea agreement—whether explicitly or implicitly, intentionally or inadvertently—the defendant is entitled to vacatur of the sentence and resentencing before a different district judge. *See Santobello*, 404 U.S. at 262-63; *Johnson*, 187 F.3d at 1136; *Whitney*, 673 F.3d at 974-75; *Alcala-Sanchez*, 666 F.3d at 576-77. Because "[t]he integrity of our judicial

56

system requires that the government strictly comply with its obligations under a plea agreement," it does not matter "that the statements may have had no effect upon the sentence." *Mondragon*, 228 F.3d at 981. In other words, prejudice is presumed. Moreover, because the government breached the plea agreement, the general waiver of appeal in Kamon's plea agreement is unenforceable, and his sentence must be reversed. *See United States v. Gonzalez*, 16 F.3d 985, 990 (9th Cir. 1993) (government's breach of plea agreement releases the defendant from his promise not to appeal such that he may raise any claim relating to the sentence).

## C. This Court may reach the merits of Kamon's illegal sentence.

Even if the Court disagrees that implicit breach permits it to reach the merits of Kamon's appeal, review of the merits is proper because Kamon's sentence is illegal. Unconstitutional sentences are not protected by a general appeal waiver like the one in Kamon's plea agreement. *United States v. Wells*, 29 F.4th 580, 584 (9th Cir. 2022); *see also United States v. Bibler*, 495 F.3d 621, 624 (9th Cir. 2007) (appellate waivers inapplicable to claims the sentence violates the law). Under the illegality exception to appellate waivers, this Court has explained that the constitution imposes a "floor below which a defendant's … sentencing may not fall." *United States v. Torres*, 828 F.3d 1113, 1124-25 (9th Cir. 2016). As such, an appellate waiver "does not deprive" a defendant of constitutional claims. *Id*; *see also Wells*, 29 F.4th at 584 (a waiver of appellate rights cannot "bar a defendant from

challenging an *illegal* sentence," and a sentence violating the constitution is plainly illegal) (cleaned up).

Because Kamon presents constitutional challenges to his sentence—namely, (1) that the district court's computation of the Guidelines utilizing *intended* loss rather than actual loss violated the Ex Post Facto clause, as set forth above in Section VIII(A)(2)(b), and (2) that the court's receipt of the trustee's unreliable, statutorily-unauthorized sentencing presentation violated due process, as set forth above in Section VIII(A)(1)—this Court may consider the merits of his appeal.

Finally, even a knowing and voluntary waiver will not be enforced if to do so would result in a miscarriage of justice. *See Hunter v. United States*, 146 S.Ct. 1702 (2026). While *Hunter* cautioned that its rule "sets a high bar" and is not for "standard-fare errors," *id.* at 1713-14, here, the compendium of substantive and procedural errors is "of the type that would undermine public confidence in the judiciary." *See id.* To enforce Kamon's appeal waiver—and thereby permit the district court to abdicate its duty to impose a sentence sufficient but not greater than necessary, leaving Kamon to serve a prison term riddled with error—would be a miscarriage of justice. *See id.*

## IX. CONCLUSION

For these reasons, Kamon's sentence must be reversed and the case remanded for resentencing.

Dated:  August 11, 2026     Respectfully submitted,

**COHEN WILLIAMS LLP**


By:      */s/ Alyssa D. Bell*
         Alyssa D. Bell
         *Attorneys for Defendant-Appellant*
         *Christopher Kazuo Kamon*

Dated:  August 11, 2026     **WILLKIE FARR & GALLAGHER LLP**


By:      */s/ Koren Bell*
         Koren Bell
         *Attorneys for Defendant-Appellant*
         *Christopher Kazuo Kamon*

59

## <u>CERTIFICATE OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Appellant states that the following cases are related to this appeal:

*United States of America v. Colar*, Case No. 23-2939

*United States of America v. McClellon*, Case No. 24-3406

Dated:  August 11, 2026        **COHEN WILLIAMS LLP**

By:      */s/ Alyssa D. Bell*
             Alyssa D. Bell
             Attorneys for Defendant-Appellant
             Christopher Kazuo Kamon

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that this opening brief is proportionally spaced, has a typeface of 14 points

and contains approximately 12,729 words.


Dated:  August 11, 2026          **COHEN WILLIAMS LLP**


By:  <u>    */s/ Alyssa D. Bell*          </u>
Alyssa D. Bell
Attorneys for Defendant-Appellant
Christopher Kazuo Kamon